THE OCCUM COMPANY *vs.* THE A. & W. SPRAGUE MANU-
FACTURING COMPANY.

The Flowage Act provides that when any person shall *desire to set up a water-mill* on his land he may bring a petition for the right to flow the lands above. A company owned a dam the water power of which they leased to mill owners, and brought a petition for the right to increase the height of the dam, not intending to erect a mill themselves, but to lease the power to other parties who would set up mills upon the land of the petitioners. Held that the case came within the statute.

The statute provides that no dam shall be erected to the injury of any lawfully existing mill or of any mill site lawfully in use for a mill. The respondents had a mill above on the same stream and had a raceway below their mill with a fall of two and a half feet. This fall they had reserved as a means of increasing their power if they should find it necessary and were intending to make use of it for that purpose. Held that the fall properly belonged to their mill site, and was to be regardéd as lawfully in use, and so was protected by the statute.

Where certain small mills were erected and used by the respondents for the purpose of protecting the site occupied by them against the application of the petitioners, but which were of no practical use as mills, it was held that they were not to be regarded as lawfully existing mills within the statute and were not protected by it.

Whether a petition under the Flowage Act can be removed to the Circuit Court of the United States on a motion of a respondent who is a citizen of another state : *Quære.*

Where a motion was made in the Superior Court for such a removal, which was

denied by the court, and after the report of a committee finding the facts the case was reserved for the advice of this court, "upon the questions arising on the report, and also on the question what decree should be passed upon the facts reported," the court refused to consider the question whether the case ought not to have been removed to the United States court.

PETITION under the Flowage Act; brought to the Superior Court in New London County. Both parties were corporations, the petitioners of this state and the respondent corporation of the state of Rhode Island, the latter having its principal office and the residence of its stockholders there.

The petition alleged that the petitioners were the owners in fee of a certain tract of land situated on both sides of the Shetucket river in the towns of Norwich and Sprague in New London county, [describing it,] and that they desired to set up a water mill on the land ; and that for the purpose of obtaining from the water of the river the power necessary for the working of the mill, the petitioners also desired to erect and maintain upon the land, across the river, a dam of the height of a level one foot below the wheels in the easterly end of the Baltic Cotton Mills in the town of Sprague ; which dam would so raise and set back the waters of the river that the same would flow certain lands belonging to the respondents, [describing them ; ] averring that the erection of the dam and flowage of the respondents' lands would be for public use and would not operate to the injury of any mill lawfully existing either above or below it on the Shetucket river, nor to the injury of any mill site on the river on which a mill or mill dam had been lawfully erected and used. The petition was dated November 1, 1865.

The respondents appeared at the first term of the court and filed a motion that the case be removed to the Circuit Court of the United States, next to be holden in the district of Connecticut, averring that they were a corporation organized under the laws of the state of Rhode Island, and located in that state, and that all the officers and stockholders of the corporation were citizens and residents of that state, and that the matter in dispute exceeded the sum of five hundred

dollars, exclusive of costs, and offering surety for their entering the case in that court. The court (*Park, J.,*) denied the motion, on the ground that the cause was of such a nature as not to be removable.

The case was then referred to a committee, who made the following report :—

"The undersigned, having heard and duly considered what was offered on behalf of the parties in said cause, and visited the premises to be affected, do find the facts and report as follows in the case :—The petitioners at the date and service of their petition were the owners in fee of the tract of land and premises described in the petition as owned by them, and through and by which the river Shetucket runs, and it then was and still continues to be their desire to have a water mill and water mills set up on their said lands; but it does not appear to the committee that the petitioners have ever desired or intended themselves to set up such mill or mills, but rather that this might be done by others, and to this end themselves to sell and convey to others, by lease or otherwise, the right to set up and maintain such mill and mills on the petitioners' said lands. For the purpose of obtaining from the waters of said river power for the working of such mills, said petitioners when they brought said petition desired, and still desire, to erect and maintain upon their said land across said river, near Lovett's bridge, so called, a dam of the height of a level one foot below the wheels on the eastern end of the Baltic cotton mill in said Sprague, belonging to the respondents, and thereby flow the respondents' lands mentioned in the petition. The respondents at the date and service of the petition were and still are the owners of a large tract of land on which their said Baltic mill is located, and which includes the premises easterly of and below said mill on said river, and alleged in the petition to belong to the respondents and sought to be flowed. A dam of the height prayed for in said petition would set back the water in said river upon said lands of the respondents above and beyond the point prayed for in said petition, to wit, the easterly end of the southerly side of the raceway of said Baltic mill. We

further find that the wheels in the easterly end of said Baltic mill are three in number, and that the bottom of the most western of these is one inch and forty-four hundredths, and that of the most eastern seventy-two hundredths of an inch, below the bottom of the middle one. The distance down stream, from the easterly end of the southerly side of said Baltic mill raceway, to the point in the thread of the said river where the respondents own both banks and the whole bed of said river, is about fourteen hundred feet, and the south bank and south half of said river bed is owned by said respondents a further distance down of near six hundred and seventy feet. From before the bringing of said petition, and ever since said Baltic mill was built, there has been a fall of between two and three feet in said river below said mill, and between the same and the easterly or down stream line of the respondents' ownership of both banks and the whole bed of said river, and a further fall of something like nine inches from thence to the extreme easterly point of the respondents' ownership of the south bank and south half of the bed of said river. Before and at the bringing of said petition the respondents were desirous of increasing their works at said Baltic mill and erecting a new mill in connection therewith and below the same on the north bank of said river, on lands adjacent to their ownership of said north bank; which lands, however, sufficient to place such new mill on, the respondents did not then own, but have since and shortly after the commencement of these proceedings acquired. They had surveys made with reference to setting such new mill on such lands, so as to avail themselves in driving the new mill of the said fall below the present mill. They had also taken action towards securing further rights of flowage up stream by raising the Baltic dam so as to increase the power for such new works as well as for said Baltic mill; but your committee find that nothing conclusive and definite with respect to a new mill had been determined on by the respondents when the present petition was brought. The dam proposed by the petitioners at the highest point hereinafter fixed by the committee, to wit, a level one foot and thirty one hundredths be-

low the westernmost wheel in the east end of said Baltic mill, will not interfere with or affect the running of said mill as it was at the date and service of said petition and still continues. Your committee further find that there is a small stream called Beaver Brook, near the mouth of which there is, and before the bringing of said petition had long been, an ancient mill and mill dam, which stream flows through the said lands of the respondents into said Shetucket river on the south side thereof, fifteen hundred feet or more above where the respondents own both banks of said river. On the 9th of October, 1865, the respondents made surveys with reference to fixing the height of two small water wheels, one to be located at the extreme point of the respondents' land down stream on the south bank of said river and six hundred and seventy-six feet below their ownership of the other bank, and the other wheel to be located on the same south bank of said river just above the point where the respondents owned both banks; which wheels it was intended should be driven by water drawn from said Beaver Brook by means of a dam and trench conducting the water to the wheels. The respondents fixed the heights of the aprons for said wheels on the 2d of November, 1865, and about this time they had said trench dug and completed, said new wheels built and put in at the places proposed, two small mills erected in connection with said wheels, the water brought to them from said Beaver Brook, and the said wheels and mill put in operation thereby,—all with great dispatch. Except said surveys of the 9th of October, 1865, and the fixing the heights of the aprons on the 2d of November, 1865, the committee had no definite dates given them as to these Beaver Brook operations. Part were before and part after the date of the petition and the 2d of November, 1865. What the proportion was the committee cannot say.

"The committee find that the object of the respondents in their said Beaver Brook proceedings, was to protect what they deemed their rights in the power and flow of said Shetucket river below their said Baltic mill to the eastern extremity of their ownership, from any attempt on the part of

the petitioners to obtain the right to flow the same ; and that said small mills are and have been of no other practical use. If said new mill operated from Beaver Brook and farthest down stream on said river is to be deemed, under the facts found, as at the time of the service of the petition a lawfully existing mill on said Shetucket river under the act of the legislature on which said petition proceeds, we find that any flowing asked for by the petition will be an injury to a mill of the respondents on said river lawfully existing at the service of said petition. If not, and the upper of said mills operated from Beaver Brook is under the facts found to be deemed as, at the service of the petition, a lawfully existing mill on said Shetucket river, your committee find that the flowing of the said land of the respondents up to the line where the respondents own both banks and the whole bed of said river, will be of public use, but beyond that point an injury to a mill of the respondents lawfully existing on said river at the service of said petition. If neither of said new Beaver Brook mills is to be deemed as, at the service of said petition, a mill lawfully existing on said Shetucket river, yet if the fall in said river between the easterly end of the southerly side of said Baltic mill race-way and the point below where the respondents own both banks and the whole bed of said river is to be deemed a part of said Baltic mill, or a part of the site thereof, we find that any flow of the respondents' land above the last named point, as sought in the petition, will be an injury,—on the first supposition, to a mill of the respondents lawfully existing on said river at the service of said petition, and on the second supposition to a mill site of the respondents on said river on which a mill and mill dam of the respondents had been lawfully erected, and was, when the petition was served, in lawful use, with the right in the respondents to have and maintain the same no wise impaired, otherwise than as the flowing of the respondents' lands, as sought in the petition, may be as above an injury to a mill of the respondents lawfully existing on said river, or to the mill site of said Baltic mill. The undersigned find that a dam such as is asked for, and at the place proposed, but at a lower

height, to wit, a level one foot and thirty one hundredths be-
low the bottom of the lowest, that is, the most western wheel
in the east end of the said Baltic mill, will flow the said lands
of the respondents as asked in said petition, and that such
flowage for the purposes desired as aforesaid by the petition-
ers will be of public use; and they accordingly establish the
height to which such dam may be built and the water raised
thereby, to be a level one foot and thirty one hundredths below
the bottom of said westernmost wheel of the east end of said
Baltic mill; and that the same may be kept at that height
during the whole of each year. If however the court is of
opinion that the said upper Beaver Brook mill was, under the
facts found, a lawfully existing mill on said Shetucket river at
the service of said petition, the committee find that said dam
cannot be raised higher than a level of one foot and ninety-
seven hundredths below the said westernmost wheel in the
east end of said Baltic mill without injury to said upper
Beaver Brook mill, and they find that such dam at the last
named height will flow the lands of the respondents asked to
be flowed in said petition, and that such flowage for the pur-
pose desired by the petitioners, as before found, will be of
public use, and in that case we fix the height to which the
dam prayed for may be built and the water raised thereby, at
a level one foot and ninety-seven hundredths below the bot-
tom of the westernmost wheel in the east end of said Baltic
mill, and that the same may be kept at that height during the
whole of each year.

" And your committee having duly considered all that was
offered to them on the subject of the damages caused by the
flowage of the respondents' lands, are of the opinion upon the
evidence and considerations submitted, and do find, that the
damage to the land of the respondents occasioned by the right
to flow such land, and the flowing the same, to either of the
heights and by either of the dams in any event established,
according to this report, will be ten dollars, and we assess the
sum to be paid to the respondents by the petitioners for such
right to flow at ten dollars. "

The court accepted the report, and reserved for the advice

of this court " the questions arising upon said report and also the question what order or decree should, upon the facts contained in said report, be made in said cause."

*Halsey* and *Pratt*, with whom were *Wait* and *Hovey*, for the petitioners.·

1.  The question of jurisdiction is not open for discussion. The cause is not before this court, but simply certain questions arising upon the report of the committee, which were reserved by the Superior Court for the advice of this court. If the question is before this court, it is apparent upon the record that the application was properly denied, for it does not appear that the amount in controversy exceeded $500, exclusive of costs. But the cause was not subject to removal. It is not a " suit of a civil nature at common law or in equity," within the judiciary act of 1789. The jurisdiction of the Circuit Court depends upon the acts of Congress ; they do not derive their power from the constitution. *Livingston* v. *Van Ingen*, 1 Paine, 45. The entire judicial power contemplated by the constitution has not been conferred on the Circuit Court. The constitution has defined the judicial power, and has not prescribed how much of it shall be exercised by that court. *Moffat* v. *Soley*, 2 Paine, 103 ; *Cary* v. *Curtis*, 3 How., 245. Such cases only are liable to removal as might have been brought before the Circuit Court by original process. *Smith* v. *Rines*, 2 Sumn., 338 ; *Beardsley* v. *Torrey*, 4 Wash. C. C., 286. The defendants admit that it is not a suit at common law. They claim it to be a suit in equity. The equity jurisdiction is derived solely from the act of Congress. *Livingston* v. *Van Ingen*, 1 Paine, 45 ; *Lorman* v. *Clarke*, 2 McLean, 568. Those judicial powers which the English court of chancery, acting in its *judicial* capacity as a court of equity, possessed and exercised at the time of the formation of the constitution, were conferred on the Circuit Court. *Fontain* v. *Ravenel*, 17 How., 384 ; *State of Pennsylvania* v. *Wheeling Bridge Co.*, 13 id., 519. The jurisdiction is uniform throughout the United States. Brightly's Federal Digest, 283. It is not every controversy between

citizens of different states, therefore, that can be removed, but only those in which by the act of Congress the right ·of removal is given. Suits for divorce and alimony are not such suits. *Barber* v. *Barber*, 21 How., 582. Nor proceedings for laying out highways, taking land for school houses, jails, court houses, railroad depots or tracks, or for flowage of lands under the mill acts. The latter is the exercise by the state of its right of eminent domain. All property within the jurisdiction of the state, whatever, belonging to citizens of this or of other states, is subject to this right within constitutional limits.

2. The petitioners bring themselves within the requirements of the statute authorizing these proceedings. They own lands, as the committee find, on which they desire to erect a dam, and to have mills erected to be operated by means of the power so obtained. The committee find that it was rather their desire to have these mills built by others than by themselves, so far as appeared to them. This use of the water clearly brings them within the law. Can it make any difference in the matter of public use whether the dam and mills belong to the same person? The statute clearly contemplates that they need not. It provides for the erection of a dam on land of another with his consent. The mill and dam both might be on land of another. The only test is whether it is to be used for the purposes contemplated by the statute. The statute is to be so construed as to give effect to the great and beneficent object it had in view—the erection and supply of water power manufactories. The question whether the petitioners desire to erect mills on their lands was only incidentally before the committee, and it is apparent that they did not attach any importance to it, as they made no allusion to the facts in relation to the two mills already built on the lands of the petitioners, and to the others in contemplation when our rights to flow are established.

3. The report of the committee presents an alternative finding, depending upon the construction of the 390th section of the statute. Gen. Statutes, p. 90. But it clearly appears from the report that a dam raised to the highest point named ·

by the committee, will not *in fact* injure the Baltic mill or affect its running, and that the raising of the dam as asked for by the petitioners will be of public use to a certain height, which height is established by the report. The case then resolves itself into this : whether there is anything in the peculiar situation of these respondents as riparian proprietors to exempt their land from the operation of the flowage law, under the section which protects mills and mill-sites. The law applicable to the case may be summed up in the following propositions :—1st. A riparian proprietor is entitled to avail himself of the full fall of water on his own land, and if he builds his dam so as to occupy such entire fall, he cannot be deprived of it by any other proprietor, either above or below him. But this applies only to the extent to which he shall have actually occupied and appropriated the stream. As to all the surplus power upon his own land not occupied by him, another riparian proprietor may obtain the right to use the same for mill purposes by appropriate proceedings under the statute. *Cary* v. *Daniels,* 8 Met., 466 ; *McKinney* v. *Smith,* 21 Cal., 381 ; Washb. on Easements, 337 ; *Olmstead* v. *Camp,* 33 Conn., 532.—2d. This occupation must be actual, and not rest merely in intention, for an intention to occupy, however strongly expressed, will be of no effect unless followed by an actual appropriation. Washb. on Easements, 336 ; *Kelly* v. *Natoma Water Co.,* 6 Cal., 105 ; *Ortman* v. *Dixon,* 13 id., 33 ; *Cary* v. *Daniels,* 8 Met., 466. Applying these principles to the facts found by the committee it is seen,—1. That the respondents had not actually occupied the land in question for mill purposes. They were desirous, as the report finds, to enlarge their mill, and they had had surveys made with reference to flowing above as well as using the fall below the mill, but nothing definite had been determined upon when the petition was brought, and nothing has since been done towards occupying the fall. The authorities show conclusively that mere intention or desire does not give an exclusive right of appropriation. Therefore the respondents can claim no protection on this ground.—2. That the dam of the petitioners

may be raised to the highest point indicated, (on a level one foot and thirty-one hundredths below the westernmost wheel in the Baltic mill,) with no injury to the mill. Therefore no defence can be made on the ground that it would be an injury to the Baltic mill.—3. As to the two little mills, they are not mills lawfully existing on the same stream, so that the exemption of the statute would apply to then. They are mills deriving all their power from Beaver brook. The mere fact that the respondents located them by the side of the Shetucket river, does not change their character. They are fed by a canal from Beaver brook, and depend for their motive power on the waters of that brook. In no sense then are they mills lawfully existing on the same stream. *Bates* v. *Weymouth Iron Co.*, 8 Cush., 548. It will be seen, further, by reference to the report, that the only use of these mills was to be a fancied legal barrier to the petitioners acquiring the right to flow this land, and that they were " of no other practical use." Is it not an absurdity to claim that these were mills lawfully existing, when their only use was to prevent the land being taken for public use? A mill, in the sense of the statute, must mean buildings, machinery and power that can be used for some practical purpose. How could the petitioners flow to the *injury* of such mills as these were? Therefore, as these little mills were not on the same stream, and as they were of no practical use, they afford no defence for these respondents.—4. Leaving then these little mills out of the question, does it injure any mill-site of the respondents? It appears by the committee's report that there was no fall on this piece of land which made it an independent mill-site. If made available at all, it could only be in connection with the main privilege. It has already been shown that by their acts the respondents had appropriated the whole of the power they wished for that mill-site, and left this fall below the mill unappropriated. So much of the actual fall as was needed for the proper working of the Baltic mill, including its race-way and discharge, constitute a part of that mill-site. All the surplus power not occupied was open to be taken by the lower riparian proprietor. It was a

question of fact, whether there was or was not any such surplus. The committee have found there was, and under this finding there must be a decree for the petitioners to the highest point named.

*Foster* and *Starkweather*, with whom was *Tenny*, for the respondents.

1. The Superior Court should be advised to allow the motion to remove the cause to the Circuit Court of the United States and to proceed no further in the cause. From the facts found on the record the defendants were entitled to make such removal on complying with certain terms and conditions required by law, which terms and conditions the record shows were fully performed and complied with by them. U. States Constitution, Art. III., §2 ; 1 U. S. Statutes at Large, 78, 79, §11, 12 ; *Kanouse* v. *Martin*, 15 How., 198 ; *Same* v. *Same*, 14 id., 23 ; *State of Pennsylvania* v. *Wheeling Bridge Co.*, 13 id., 518 ; *Baltimore & Susquehanna R. R. Co.* v. *Nesbit*, 10 id., 395 ; *Gordon* v. *Longest*, 16 Pet., 97 ; *United States* v. *Howland*, 4 Wheat., 108.

2. It is necessary for the petitioners to prove that they desire and intend to set up a water mill and to erect a dam for working the same. The first section of the statute provides that " when any person shall desire to set up a water mill on his own land, or upon the land of another by his consent, and to erect a dam on the same for working such mill by water, which dam would flow water upon land belonging to any other person, he may bring his petition &c." No such desire or intention on the part of the petitioners is shown. But on the contrary the committee find that " it then was and still continues to be their desire to have a water mill or water mills set up on their said lands ; but it does not appear to the committee that the petitioners have ever desired or intended themselves to set up such mill or mills, but rather that this might be done by others, and to this end themselves to sell and convey to others by lease or otherwise the right to set up and maintain such mill or mills on the petitioners' said land." It is clearly the intention of the statute that the person bringing his petition under this act should desire and

intend to erect the mill. It certainly cannot be its intention to allow any person to flow the land of another against his will, simply because the petitioner desires to acquire a water power to hold for speculative purposes and lease as he may happen to find customers. Gen. Statutes, 91, §396; Washburn on Easements, 332, 333, §§13, 14; id., 339, §23; *Jordon* v. *Woodward*, 40 Maine, 322. No proceeding under this act should be sustained unless every condition is complied with. Angell on Water Courses, 525; Washburn on Easements, 324, 325, 333, 348; *Rex* v. *Croke*, Cowper, 26.

3. The act further provides that "no such dam shall be erected to the injury of any mill lawfully existing, either above or below it on the same stream, or the injury of a mill-site on the same stream on which a mill or mill dam shall have been lawfully erected and used, unless the right to maintain a mill on such last mentioned site shall have been lost or defeated by abandonment or otherwise." The committee find that "if the fall between the easterly end of the southerly side of the Baltic mill race-way and the point below where the respondents own both banks and the whole bed of the river, is to be deemed a part of the Baltic mill, or a part of the mill-site thereof, any flow of the respondents land above the last named point, as sought in the petition, will be an injury, on the first supposition to a mill of the respondents lawfully existing on the river at the service of the petition, and on the second supposition, to a mill-site of the respondents on which a mill and mill dam had been lawfully erected by them, and was, when the petition was served, in lawful use, with the right in the respondents to have and maintain the same in no wise impaired." The fall below the Baltic mill, commencing at the race-way, as described in the report of the committee, is within the meaning of the statute a part of said mill and mill-site. The word "mill," as here used, means not only the building, but it includes the wheels, machinery, race-way, and the head and fall, or the water privilege. *Wetmore* v. *White*, 2 Caines Cas., 87; *Butz* v. *Ihrie*, 1 Rawle, 218; Washburn on Easements, 245. The term "mill-site" does not mean merely the land on which a mill is or

may be located, but it means the privilege—the fall above and below that may be made available. *Farrar* v. *Cooper*, 34 Maine, 394; Washburn on Easements, 265, §§23, 24. It is further found by the committee that " before and at the bringing of said petition the respondents were desirous of increasing their works at said Baltic mill so as to avail themselves of the fall below said mill." It is clearly shown that the fall below the Baltic mill was a part of the privilege, or in other words a part of the " mill" within the meaning of the statute, and that before the petitioners brought their petition, the respondents, in good faith, had made surveys and other arrangements to use the fall. It would be clearly in violation of the statute to allow the petitioners to destroy the privilege.

4. Under the facts found by the committee the mills on Beaver brook are " lawfully existing mills" within the meaning of the statute. Arrangements for erecting these mills were made before the bringing of the petition. It is not necessary for the protection of our rights that these mills should be completed or even commenced before the bringing of the petition. It is sufficient that they were erected for a lawful purpose, or, in the language of the statute, that they were " lawfully existing mills," before the erection of a mill by the petitioners.

HINMAN, C. J. On the report of the committee in this cause being presented to the Superior Court, that court, instead of taking any order upon it, reserved the questions arising upon it, and also the question what order or decree should, upon the facts contained in the report, be made in the cause, for the consideration and advice of this court. Upon the cause coming before us on this reservation we are asked to look back at a former decision of the Superior Court, made several terms before the report of the committee was made, denying the motion of the respondents for the removal of the cause for trial into the Circuit Court of the United States, then next to be held in and for the district of Connecticut; and we are asked to do this upon the ground that the proceedings in the Superior Court subsequent to that mo-

tion, if the cause be one that the party had a right to remove into the Circuit Court, are all void; as will be also the proceedings of this court if it entertains the cause. It may be true that such would be the result of proceeding with the cause, if it was one that the party had a right to remove to the Circuit Court. Still, we entertain no doubt that we ought not now to listen to a claim of this sort, whatever we might think of the propriety of the former decision of the Superior Court. It may be true that in a case clear of all doubt as to the right of the party to remove it, the court may and would in any stage of it, on discovering that it had no jurisdiction of the cause, refuse to entertain it further. But in a case which the Superior Court has once decided upon argument not to be removable, we think the only proper course is to consider only such questions as that court desired our advice upon and leave all others to such future consideration as we may be called to give them in some more direct proceeding. It is to be remembered that the statute under which questions of law are reserved for the advice of the Supreme Court of Errors makes our advice, when properly asked for, binding upon the Superior Court. But when we assume to advise that court in respect to questions not regularly reserved, our advice may be regarded or not as to that court shall seem best, and if we are to pass upon the decisions of that court we prefer to do it on some regular motion or writ of error, which will render our decision binding, rather than to volunteer our advice upon the suggestion of counsel only. We have not therefore looked into the cases cited, or examined very carefully the learned arguments of the respondents' counsel on this subject.

In regard to the main question on the report of the committee, we fully assent to the suggestion of the respondents' counsel, that the statute under which this proceeding is had, authorizing, as it does, the taking away from another of all beneficial use of his property in certain cases and depriving him it may be of some of his most cherished rights, and that for objects not always much more beneficial to the public than the purposes to which the land was devoted before it

was taken, ought to be strictly construed in favor of the owner of the land, and against the parties seeking to take it. The mill acts must now be regarded as constitutional; still, as they authorize the taking of property against the wishes of its owners, the latter have a right to demand a strict compliance with all the provisions of the acts before they are to be deemed to have lost their property.

Under this idea, the respondents first claim that it does not sufficiently appear that the petitioners desire to erect a water mill to be operated by the water with which they propose to flow the respondents' land. This desire is alleged in the petition, but it is said that the committee have not found it, because they find that although it is their desire to have water mills set up on their lands, yet as their desire is rather to sell or lease the power thus obtained than themselves to occupy it, they do not bring their case within the statute. We are of opinion however that a desire to have a water mill erected by another person under the petitioners' lease or license is the same in effect as if they desired to erect it themselves. Indeed in a legal sense, it is a desire themselves to erect water mills, since what they cause to be done by others is in effect done by them. If there was any doubt as to the fact that water mills would be set up, or that others which are already erected and in operation would be more successfully carried on, after obtaining the privilege of flowage which the petitioners desire, the point might be worthy of more consideration. But when it appears from the maps which the parties have caused to be made of these premises, for the purpose of reference on the argument of the case, that the petitioners have already erected a dam and obtained a valuable water power thereby, which power they wish to increase by raising their dam to a greater height instead of erecting entirely new works; and when it appears moreover from the public maps of the county to which counsel have referred, that there are already one or more mills operated by the water held by the dam as it now is, the question is involved in a technical nicety which we do not feel bound to regard.

The statute provides " that no such dam shall be erected to the injury of any mill lawfully existing, either above or below it on the same stream, or to the injury of a mill-site on the same stream on which a mill shall have been lawfully erected and used, unless, " &c. Now the respondents own what are called the Baltic Cotton Mills, and between the lower or easterly end of the southerly side of the Baltic Cotton Mill race-way and the point in the river below down to which the respondents' own both banks of the river and the bed of it, there is some fall, not exceeding however two or two and a half feet, and the committee say that if this fall is to be deemed a part of that mill, or of its mill-site, then they find that any flow of the water above the point where the respondents own both banks and the bed of the stream will be an injury either to the Baltic mills, or to a mill-site of the respondents on which a mill and mill dam had been lawfully erected.

We are satisfied, under the construction which we have said should be given to this law, that this fall is a part of the Baltic mill-site within the meaning of the statute. A mill-site is the same as a mill privilege, which, in *Gould* v. *Boston Duck Co.*, 13 Gray, 442, was said " to embrace the right which the law gives the owner to erect a mill thereon, and to hold up or let out the water at the will of the occupant for the purpose of operating the same in a reasonable and beneficial manner." It must of necessity include a reasonable amount of fall below the mill for the purpose of letting the water flow off without obstruction to the wheels, and we do not think it reasonable to confine the right of the mill owner to the exact amount of fall, to the fractional part of an inch, which will enable the water to flow away from his wheels without obstruction, especially where it appears that he has all along contemplated using his whole fall. The Spragues purchased their land under the bed of the river and on its banks, it may fairly be assumed, for the purpose of obtaining a valuable mill-site. They erected their mill, using all their fall except two or three feet below their mill, which they reserved for future

use when the demands of their business might render it useful to them. Before the bringing of this petition they were contemplating using this fall by adding to their present works, and had surveys made with reference to erecting a new mill below the present one. In a statute of this sort is not their desire to improve this fall as much to be regarded as the desire of the petitioners? Must they immediately put in use all their available water power in order to preserve their right to it? Does the law allow a part of their privilege to be taken from them while they are in the act of preparing to use it? If so, then this law will prove less beneficial to some mill owners than they expected when they were urging its enactment. If the mill owner is acting in good faith in reserving two or three feet of his fall of water for future use as he may find it necessary or beneficial, he ought to be protected in such reservation. He may by reason of something which could not have been foreseen or which ordinarily would not have been anticipated at the time his mill was erected, find it necessary to deepen his raceway or lower his wheels for the purpose of getting the full use of his mill and the full benefit of the privilege, and we think it entirely proper for him to reserve a small part of his fall to provide against contingencies of this sort. And if it is reserved for such a purpose, as we think it is in this case by a fair inference from the facts reported by the committee, and not for the purpose of preventing other persons who may be desirous of erecting mills below him on the same stream from acquiring rights to which they might otherwise be entitled, we think it would be unreasonable to deprive him of this right, and in such a case it is no strained construction of language to hold, as we do, that the fall thus reserved is a part of his mill-site.

In regard to what are called the little mills, operated by water drawn from Beaver brook, the court are of opinion that those structures are not mills within the meaning of this statute. They were not, according to the report of the committee, constructed as mills for any practical beneficial use, and

are not and never have been of any use. This of course is not because they are so small as to be called little mills. The size of the mill is of no other importance than as evidence tending to show, with other circumstances, that they were not erected for use as mills ; as in this case, for the purpose, as the committee say, of protecting what the projectors of them deemed their rights in the power and flow of the river below their Baltic mill. No doubt they might, under some circumstances, accomplish such an object by the erection of a mill. But then it should be a mill for some practical use and benefit other than the mere protection of their right to the fall of the water. If erected and operated, so far as operated at all, solely for this purpose, it has only a colorable and delusive resemblance to a mill, and such we understand these structures to be. We have not therefore considered any of the questions in respect to whether or not they are upon the same stream that the petitioners desire to dam.

The result of the whole case is, that the Superior Court is advised to accept the report of the committee, and to grant the prayer of the petition so far as to allow the petitioners to set or flow back the water of the Shetucket River up to the point in the stream where the respondents own the bed of it and the land on each of its banks, and no further.

In this opinion the other judges concurred.